UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
K. DOE, R. DOE,

                     Plaintiffs,

       - against –

STATE OF NEW YORK, et al.,

                    Defendants.
-------------------------------------------------------- x

                                    **MEMORANDUM & ORDER**

                                      10 CV 1792 (RJD) (VVP)

DEARIE, District Judge.

      The claims brought by plaintiffs, K. Doe and R. Doe, arise from the alleged creation and implementation—by the upper echelons of New York State government—of a policy to withhold from state prisoners their positive Hepatitis status and deny treatment as a cost-saving measure. Plaintiff K. Doe, a former prisoner at various New York state correctional facilities, alleges that he contracted Hepatitis while incarcerated, was not informed of the diagnosis, and was then released to unwittingly infect others with the disease. As a result of defendants' policy, plaintiff R. Doe alleges that K. Doe infected her through consensual sex upon his release.  Plaintiffs now bring an assortment of federal law claims under Section 1983 of the Civil Rights Act of 1871 ("Section 1983"), 42 U.S.C. § 1983, including Eighth Amendment medical indifference and violations of substantive due process, and pendent state law claims. Defendants move to dismiss the complaint in its entirety on various grounds, including improper venue, lack of subject matter jurisdiction, and failure to state a claim upon which relief may be granted.

## I. BACKGROUND

The pertinent allegations follow. On approximately June 6, 1976, "K. Doe was convicted of a felony and sentenced to thirty years' imprisonment in" New York State prison. ECF Docket # 21, Second Amended Complaint ("Compl.") ¶ 20. During K. Doe's incarceration, he was held at various correctional facilities, all located in the Northern District of New York ("N.D.N.Y.").

According to K. Doe's "pre-incarceration examination ordered by DOCS," K. Doe "was not infected by . . . Hepatitis B . . . or Hepatitis C" when first committed to DOCS custody. Id. ¶ 21. Throughout his incarceration, K. Doe was "subjected . . . to routine physical and medical examinations," and tests "during or about 1980, 1985, and 1990" continued to show that K. Doe was not infected with either Hepatitis B or C. Id. ¶¶ 24-25

"[I]n or about 1994" and "aware of the alarming rates of hidden [Hepatitis] and HIV infection amongst DOCS inmates," however, "NYS; Its Governor, DOCS and its commissioners . . . affirmatively decided to ignore staggering infection rate [sic] to save money because of the enormous costs of treating these inmates." Id. ¶¶ 29-30. Accordingly, these defendants:

> [D]ecided to allow infected prisoners to remain anonymous with their infections undisclosed and hidden, treating only those who discovered affliction through obvious symptons, [sic] or discovered their ailments as a result of their affirmative request to be tested. All the while, [defendants] . . . were aware of the enormous hidden population of inmates suffering asymptomatic [Hepatitis] . . . infections. All the while [defendants] continued to release these ignorant and infected inmates to the public when their terms of incarceration ended, neither treating them nor informing them of their sickness.

Id. ¶ 31.

During a routine physical and medical examination "during or about 1995," "testing revealed to DOCS that K. Doe was infected by [Hepatitis C]." Id. ¶ 26. Routine physicals and medical examinations "during or about 2000 and 2005 . . . continued to find K. Doe infected with [Hepatitis C]," and "additional tests also revealed to DOCS that K. Doe was infected with [Hepatitis B]." Id. ¶ 27. At no point from the time K. Doe was diagnosed with Hepatitis C in 1995 "to the point of his release from imprisonment in 2007," however, did defendants "ever inform[], counsel[], or treat[] K. Doe for his infection with [Hepatitis B or C]." Id. ¶ 33.

On approximately August 20, 2007, only one month following his release and "not knowing of his [Hepatitis] infection[,] . . . [K. Doe] had unprotected coitus with R. Doe . . . exposing her to [Hepatitis B and C] infection." Id. ¶ 34. As a result, "R. Doe has become infected with [Hepatitis B and C] in advanced form." Id. ¶ 55.

K. Doe only discovered his Hepatitis infection when in March 2008, after being diagnosed with "chronic cirrhosis of the liver," K. Doe's private physician sent him for further testing, which "revealed to K. Doe that he suffered [Hepatitis B and C] advanced infections." Id. ¶ 35. K. Doe's private physician then requested and received K. Doe's medical history from DOCS and "discovered that DOCS knew of K. Doe's [Hepatitis] infection for nearly 12 years without either informing K. Doe or giving him counseling or treatment for his [Hepatitis B and C] infections." Id. ¶ 36.

Because of the 12-year delay in treatment, K. Doe's "infections are now in a more advanced stage and will not admit of treatments or lifestyle modifications that would have been effective had they been applied earlier." Id. ¶ 88. Moreover, because K. Doe

3

and R. Doe are infected with Hepatitis, K. Doe "will never be able to father," and R. Doe "will never be able to bear a child and raise a family without placing [their] partner at substantial risk of contracting a devastating disease." Id. ¶¶ 90, 100.

## II. DISCUSSION

### A. Venue

Defendants first challenge plaintiffs' choice of venue in the Eastern District of New York ("E.D.N.Y.") as improper, primarily on the ground that no "substantial part of the events or omissions giving rise to the claim occurred" in E.D.N.Y. ECF Docket # 38, Defs.' Mot. at 5 (citing 28 U.S.C. § 1391(b)(2)). Defendants accordingly move the Court to dismiss the entire complaint for improper venue under Fed. R. Civ. P. 12(b)(3), or, in the alternative, transfer the case to N.D.N.Y. under 28 U.S.C. § 1406(a). The Court is not persuaded. Plaintiffs' cause of action is properly venued in E.D.N.Y. under the doctrine of pendent venue and the Court declines to transfer the case elsewhere.

### 1. Venue is Proper in the Eastern District of New York

Pendent venue allows "a federal court . . . in its discretion [to] hear pendent claims which arise out of the same nucleus of operative fact as a properly venued federal claim, even if venue of the pendent claim otherwise would not lie." Hsin Ten Enter. USA, Inc. v. Clark Enter., 138 F. Supp. 2d 449, 462 (S.D.N.Y. 2000) (Scheindlin, J.) (internal quotation marks omitted). In applying pendent venue, the Court must first determine the "primary claim" and second, "apply the venue statute applicable to that claim." Cold Spring Harbor Lab. v. Ropes & Gray, LLP, 762 F. Supp. 2d 543, 552 (E.D.N.Y. 2011) (Spatt, J.) (internal quotation marks omitted). If the Court finds that venue is proper for the primary claim, "venue is proper for any subsidiary claim that

4

shares a common nucleus of operative fact with the primary claim." <u>Sea Tow Servs. Int'l.</u> <u>v. Pontin</u>, 472 F. Supp. 2d 349, 366 n. 9 (E.D.N.Y. 2007) (Bianco, J.) (quoting 14D Charles A. Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 3808 (3d ed. 2012)).

Defendants' venue challenge would be persuasive if K. Doe were the only plaintiff. This case, however, presents a thornier issue because it also involves a second plaintiff, R. Doe, whose "primary claim"—violation of substantive due process—arises from "events or omissions," a "substantial part of" which allegedly "occurred" in E.D.N.Y. <u>Id.</u> The application of pendent venue in a case with multiple plaintiffs with multiple claims, some of which may be improperly venued, however, raises a *sui generis* problem: the determination of which claim or claims are "primary." One possibility is that more than one "primary claim" exists. Just as "[28 U.S.C.] § 1391(b)(2) contemplates that venue can be appropriate in more than one district," <u>Daniel v.</u> <u>American Bd. of Emergency Medicine</u>, 428 F.3d 408, 432 (2d Cir. 2005) (internal quotation marks omitted), here venue would be proper either in N.D.N.Y. where a "substantial part of" K. Doe's "primary claim" (medical indifference) arose, or in E.D.N.Y. where a "substantial part of" R. Doe's "primary claim" (substantive due process) arose.[1] 28 U.S.C. § 1391(b)(2).

A second—and, it seems, more reasonable—approach is to determine the "primary claim" *common* to both plaintiffs. Applying this latter approach to the case *sub judice*, plaintiffs' substantive due process claims, the underlying acts and omissions of

---

[1] As will be discussed in greater detail, <u>infra</u>, plaintiffs' substantive due process claims could be venued either in E.D.N.Y. or N.D.N.Y.

which substantially overlap, are "primary" for pendent venue purposes. Having determined plaintiffs' "primary claim" in this case, the Court now turns to whether the substantive due process claims are properly venued in E.D.N.Y.

Where, as here, "plaintiff[s] rel[y] on § 1391(b)(2) to defeat a venue challenge," the Second Circuit has developed "a two-part inquiry" to determine whether venue is proper. Daniel, 428 F.3d at 432.

> First, a court should identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims. Second, the court should determine whether a substantial part of those acts or omissions occurred in the district where suit was filed, that is, whether significant events or omissions material to those claims have occurred in the district in question.

Id. (internal citations, quotation marks, and modifications omitted).

Under Daniel's first prong, the "nature of" both of plaintiffs' substantive due process claims derives from the "right to be free from . . . unjustified intrusions on personal security." Matican v. City of New York, 524 F.3d 151, 155 (2d Cir. 2008) (quoting Ingraham v. Wright, 430 U.S. 651, 673 (1977)). K. Doe's claim is based on the "special relationship" created between himself and the State by "the State's affirmative act of restraining [K. Doe's] freedom to act on his own behalf—through incarceration." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989). Under this theory of substantive due process, defendants owed K. Doe an "affirmative dut[y] of care and protection," which they allegedly breached by promulgating and implementing the policy of failing to inform and treat him for Hepatitis, ultimately resulting in the

6

deterioration of his health and his infection of another innocent individual, R. Doe.[2] Id. at 198. R. Doe's claim alleges a theory of "state-created danger" whereby "the state or its agents . . . owe a constitutional obligation to the victim of private violence if . . . [the state or its agents] 'in some way . . . assisted in creating or increasing the danger to the victim.'" Matican, 524 F.3d at 155 (quoting Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir. 1993) (overruled on other grounds)). Under this theory of substantive due process, defendants allegedly breached their duty to R. Doe by releasing K. Doe without informing him of his disease, ultimately resulting in R. Doe's infection with Hepatitis.

Having identified the "nature of" plaintiffs' "primary claim," the Court now turns to the second prong of Daniel to determine whether a "substantial part of those acts or omissions occurred in the district where suit was filed." Daniel, 428 F.3d at 432. In so doing, the Court "take[s] seriously the adjective 'substantial,'" Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 357 (2d Cir. 2005), but remains mindful that the Court is "not . . . required to determine the 'best venue,' but merely a logical one with a substantial connection to the litigation," Reliance Ins. Co. v. Polyvision Corp., 474 F.3d 54, 59 (2d Cir. 2007). The appropriate analysis is "more a qualitative than a quantitative inquiry, determined by assessing the overall nature of [plaintiffs'] claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts." Daniel, 428 F.3d at 432-33.

Defendants, however, erroneously urge the Court to apply a "*quantitative* inquiry," whereby the Court would look only to the locus of the acts of the defendants.

---

[2] K. Doe raises the novel concept that a liberty interest exists in "not infecting others with disease." Compl. ¶ 81.

7

Id. (emphasis added); see ECF Docket # 39, Defs.' Reply at 2 ("Plaintiffs fail, however, to appreciate that the 'substantial events/omissions' analysis is focused on the defendants' actions; not the plaintiffs [sic]."). Defendants, however, appear to conflate the "statutory standard for venue," which focuses "on the location where events occurred," with the standard for personal jurisdiction, which focuses on "whether a defendant has made a deliberate contact . . . ." Bates v. C & S Adjusters, Inc., 980 F.2d 865, 868 (2d. Cir. 1992). To be sure, consideration of the "relevant activities of the defendant" is a critical focus of any venue inquiry, Daniel, 428 F.3d at 432 (quoting Woodke v. Dahm, 70 F.3d 983, 985 (8th Cir. 1995)), but so too is consideration of the "locus of the injury," or "place where harm" to plaintiff(s) occurs, see Bates, 980 F.2d at 868 (holding that, although a substantial part of defendants' actions giving rise to the alleged violation of the Fair Debt Collections Practices Act occurred in Pennsylvania, venue was still proper in the Western District of New York because "the harm [did] not occur *until receipt of the collection notice*" in W.D.N.Y.) (emphasis added); Myers v. Bennett Law Offices, 238 F.3d 1068, 1076 (9th Cir. 2001) (citing Bates, 980 F.2d at 867-68) ("In a tort action, the locus of the injury [i]s a relevant factor" of the § 1391(b)(2) analysis); Astor Holdings, Inc. v. Roski, No. 01 CIV.1905(GEL), 2002 WL 72936, at *8 (S.D.N.Y. Jan. 17, 2002) (Lynch, J.) ("[T]he place where harm of a tort occurs is relevant for venue purposes.") (internal quotation marks omitted). The Court accordingly rejects defendants' one-dimensional approach and instead embraces the more holistic analysis, endorsed in Daniel, which looks to the cause of action as a whole and asks whether "material acts or omissions within the forum bear a close nexus to the claims." Daniel, 428 F.3d at 433.

8

Applying this standard, the Court concludes that venue is proper over plaintiffs' substantive due process claims in E.D.N.Y. because "significant events or omissions material to [plaintiffs'] claims have occurred" in this district. Daniel, 428 F.3d at 432 (internal quotation marks and modifications omitted). While the alleged *creation* of the unconstitutional policy may or may not have occurred in N.D.N.Y., the continued *implementation* of the policy occurred not only in N.D.N.Y. while K. Doe was still incarcerated, but also in E.D.N.Y., after his release. See Gulf, 417 F.3d at 356 ("[T]he civil venue statute permits venue in multiple judicial districts as long as 'a substantial part' of the underlying events took place in those districts"). According to plaintiffs, defendants continued to implement their policy of not informing K. Doe that he was the carrier of a serious communicable disease when he was first "released back into" Brooklyn, ECF Docket # 36, Pl.'s Opp. Mem. at 3, when he infected R. Doe in Brooklyn, and while his condition deteriorated in Brooklyn. The locus of defendants' actions alone, therefore, would suffice to confer venue in E.D.N.Y., but E.D.N.Y. is also the "locus of the injur[ies]" suffered by both K. Doe and R. Doe. After all, Brooklyn is where K. Doe was released, where K. Doe's condition advanced, where K. Doe unknowingly infected R. Doe with Hepatitis, and where R. Doe was infected with Hepatitis.

Because both the breach and the ultimate injury, two necessary elements of plaintiffs' "primary claim," occurred in E.D.N.Y., venue is proper in this district. Because plaintiffs' substantive due process claims are properly venued in E.D.N.Y., and all of plaintiffs' remaining claims "arise out of the same nucleus of operative fact," Hsin Ten, 138 F. Supp. 2d at 462, plaintiffs' subsidiary claims are also properly venued in E.D.N.Y.

If the allegations are substantiated, the State left K. Doe in the dark about his condition and then released him ignorant of the potential to infect others *wherever* situated. The infection happened to occur within the State's jurisdiction. The State should be hard pressed now to complain where within *its own jurisdiction* it should be called to account. Defendants' motion to dismiss pursuant to Rule 12(b)(3) is denied.

### 2. Whether the Case Should Be Transferred to N.D.N.Y.

The Court's determination that venue lies in E.D.N.Y. is also consistent with "notions of convenience and fairness" and thus defendants' alternative ground for transfer to N.D.N.Y. under 28 U.S.C. § 1406(a) is also denied. D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 106 (2d Cir. 2006). The inquiry into whether transfer of venue should be granted "starts with a strong presumption in favor of the plaintiff's choice of forum" and "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Norex Petroleum Ltd. v. Access Industries, Inc., 416 F.3d 146, 154 (2d Cir. 2005) (internal citations and quotation marks omitted). "Some of the factors a district court is to consider are, *inter alia*: (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties." D.H. Blair, 462 F.3d at 106-07 (internal quotation marks and modifications omitted). In this case, defendants have offered inadequate grounds to disturb the presumptive balance in favor of plaintiffs' choice of forum.

Defendants' argument that plaintiffs' choice of venue "would be unduly burdensome" for the state and state officials is baseless. Defs.' Mot. at 7-8. The State of New York, DOCS, both the current and former Governor, and the Attorney General, who is representing the named state officials, all maintain offices in Manhattan. See Cancel v. Mazzuca, No. 01 Civ.3129 NRB, 2002 WL 1891395, at *3 (S.D.N.Y. Aug. 15, 2002) (Buchwald, J.) (denying state officials' motion to transfer venue to N.D.N.Y. for, although "[i]t may be personally inconvenient for them to travel to Manhattan for the trial, . . . it is not overly burdensome for New York state officials to travel to New York City.") (internal quotation marks and modifications omitted). Defendants argument that the case should be transferred to N.D.N.Y. because of witness and documentation availability ignores the facts as pled that K. Doe's (and presumably R. Doe's) physicians have offices in Brooklyn, both plaintiffs reside in Brooklyn, and K. Doe's medical records, including his "medical history from DOCS," Compl. ¶ 36, are all located in Brooklyn. To the extent witnesses and documentation are, in fact, only located outside of E.D.N.Y., the Court is confident that defendants will be able to produce such witnesses or documentation if need be.

Taking into consideration all of the factors bearing on venue, the Court, therefore, denies defendants' motions to dismiss or transfer venue outside of E.D.N.Y.

B. Subject Matter Jurisdiction

Defendants argue that the Court lacks subject matter jurisdiction over plaintiffs' claims against the State of New York, DOCS, and the state officials in their official capacities under the Eleventh Amendment. Defendants further argue that the Court lacks subject matter jurisdiction over plaintiffs' state law claims against the defendant

11

Corrections officers in their individual capacities under New York Correction Law Section 24 ("Section 24"). The Court agrees on both counts.

### 1. Eleventh Amendment Immunity

It is well established that under the Eleventh Amendment, a state and agencies of that state are "immune from suits brought in federal courts by her own citizens as well as by citizens of another state." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984) (internal quotation marks omitted); see Santiago v. New York State Dep't of Corr. Servs., 945 F.2d 25, 28 n.1 (2d Cir. 1991) ("Agencies of [New York] state, such as DOCS, are entitled to assert the state's Eleventh Amendment immunity"). Accordingly, although claims may be brought pursuant to Section 1983 against *municipalities* and their officials, as well as state officials in their individual capacities, "neither a State nor its officials acting in their official capacities are 'persons' under [42 U.S.C.] § 1983." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). New York State has not waived its 11th Amendment immunity and there is no claim to the contrary. Therefore, all claims against New York State and DOCS are dismissed. So to, are all claims against the state officials in their official capacities.

It is true that, despite Eleventh Amendment protections, state officials may still be subject to suit in their official capacities where a plaintiff seeks "prospective injunctive relief against state officials to prevent a continuing violation of federal law." In re Dairy Mart Convenience Stores, Inc., 411 F.3d 367, 371 (2d Cir. 2005) (citing Ex parte Young, 209 U.S. 123, 160 (1908)). Here, plaintiffs' requests for injunctive or any other form of prospective relief against state officials, however, are moot because "there is no reasonable expectation that the wrong will be repeated." White River Amusement Pub,

Inc. v. Town of Hartford, 481 F.3d 163, 167 (2d Cir. 2007) (internal brackets and quotations omitted). Consequently, "it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." Id. at 168. Assuming, *arguendo*, that the alleged policy exists, no change in the policy would have any impact on plaintiffs: the wrongs K. Doe and R. Doe allegedly suffered as a result of state defendants' policy are over and cannot be repeated.

To the extent plaintiffs' purport to request injunctive or any other form of prospective relief against state officials on behalf of current inmates or third parties still at risk of infection, they lack standing to do so. Warth v. Seldin, 422 U.S. 490, 499 (1975) ("The [Article] III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action . . . .") (internal quotation marks omitted). Accordingly, the Ex parte Young exception is inapplicable to this case.

All claims brought against New York State, DOCS, and state officials in their official capacities are, therefore, dismissed for lack of subject matter jurisdiction.

2. Section 24

All state law claims brought against DOCS officers or employees in their individual capacities—here, claims for medical malpractice, infliction of emotional distress, negligent failure to train, gross negligence, and various violations of the New York Constitution—would have to be dismissed for lack of subject matter jurisdiction under New York Correction Law Section 24.

13

Section 24 provides in pertinent part:

> No civil action shall be brought in any court of the state,
> except by the attorney general on behalf of the state,
> against any officer or employee of the department, . . . in
> his or her personal capacity, for damages arising out of any
> act done or the failure to perform any act within the scope
> of the employment and in the discharge of the duties by
> such officer or employee.

N.Y. Correct. Law § 24(1) (McKinney 2011). It is thus "well settled that Section 24

shields employees of a state correctional facility from being called upon to personally

answer a state law claim for damages based on activities that fall within the scope of the

statute." Ierardi v. Sisco, 119 F.3d 183, 186 (2d Cir. 1997). Though Section 24 refers

only to the immunity of correction officers in state courts, such immunity is equally

available when "the action is pursued . . . under pendant jurisdiction, in a federal court."

Id. at 187. The alleged creation and implementation of the policy at issue in this case all

occurred "within the scope of [an officer's] employment and in the discharge of [his or

her] duties." N.Y Correct. Law § 24(1). It is immaterial that the challenged conduct may

be "violative of [DOCS] regulations . . . or otherwise beyond an officer's authority."

Ierardi, 119 F.3d at 187. What matters is "whether the act was done while the servant was

doing his master's work, no matter how irregularly, or with what disregard of

instructions." Id. (quoting Riviello v. Waldron, 47 N.Y.2d 297, 302 (N.Y. 1979)).

Accordingly, plaintiffs' state law claims against DOCS defendants in their

individual capacities are dismissed for lack of subject matter jurisdiction.

C. Motion to Dismiss for Failure to State a Claim

The only claims that remain, therefore, are plaintiffs' federal law claims—Eight

Amendment medical indifference, substantive due process, and equal protection—against

14

all individually named defendants in their individual capacities and plaintiffs' state law claims against Governors Pataki and Cuomo.

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6). In deciding such a motion, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001) (internal quotation marks omitted). The Court should dismiss a claim only where "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [the] claims which would entitle [them] to relief." Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)) (internal quotation marks and modifications omitted).

A complaint must nevertheless plead a "plausible" claim for relief to survive a motion to dismiss under Rule 12(b)(6). Harris v. Mills, 572 F.3d 66, 71-72 (2d Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Accepting all non-conclusory factual allegations as true, a claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Where plaintiffs have "not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

In order to succeed on a Section 1983 claim, "a plaintiff must show that (1) 'the conduct complained of was committed by a person acting under color of state law,' and (2) 'this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States.'" Greenwich Citizens Comm., Inc. v. Cntys. of Warren & Wash. Indus. Dev. Agency, 77 F.3d 26, 29-30 (2d Cir. 1996) (quoting Parratt

v. Taylor, 451 U.S. 527, 535 (1981)). It is well settled, however, that "[r]*espondeat*

*superior* cannot form the basis for a § 1983 claim," Hemmings v. Gorczyk, 134 F.3d 104,

108 (2d Cir. 1998), and that "personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under § 1983." Farid v. Ellen, 593

F.3d 233, 249 (2d Cir. 2010) (internal quotation marks omitted).

A supervisory official may nevertheless be held liable under Section 1983 if "the

defendant participated directly in the alleged constitutional violation [or] . . . created a

policy or custom under which unconstitutional practices occurred, or allowed the

continuance of such a policy or custom . . . ." Colon v. Coughlin, 58 F.3d 865, 873 (2d

Cir. 1995).[3]

As an initial matter, defendants are right to point out that "it is simply

inconceivable that defendant Governor Cuomo had any involvement in the constitutional

deprivations plaintiffs allegedly suffered . . . [as] he was not elected Governor of New

York State until years after the alleged deprivations occurred." Defs.' Mot. at 15.

Moreover, Commissioner Fisher, who was appointed and confirmed Commissioner of

DOCS just months before K. Doe's release from prison is not a proper party. See Colon,

---

[3] Colon v. Coughlin actually provided for three other avenues through which a supervisory official may be held liable under Section 1983, including "fail[ing] to remedy the wrong" "after being informed of the violation" and being "grossly negligent in supervising subordinates who committed the wrongful acts" or "deliberate[ly] indifferen[t] to the rights of inmates." 58 F.3d at 873. The "continuing vitality" of Colon, however, has "engendered conflict within [the Second] Circuit," Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012), after the Supreme Court in Iqbal rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." Iqbal, 556 U.S. at 677. Although the Second Circuit has yet to rule on the "fate of Colon," Reynolds, 685 F.3d at 205 n. 14, it seems clear to the Court that only the First and Third of the Colon avenues of supervisory liability, set forth in the body of this Memorandum and Order, survive Iqbal. Accord Vann v. Fischer, No. 11 Civ.1958 JPO, 2012 WL 2384428, at *5 n. 9 (S.D.N.Y. June 21, 2012) (Oetken, J.); Spear v. Hugles, No. 08 Civ. 4026(SAS), 2009 WL 2176725, at *2 (S.D.N.Y. July 20, 2009) (Scheindlin, J.) ("[O]nly the first and third Colon factors have survived the Supreme Court's decision in Iqbal.").

58 F.3d at 874 ("The bare fact that [the DOCS Commissioner] occupies a high position in the New York prison hierarchy is insufficient to sustain [a § 1983] claim."). For this reason, all claims brought pursuant to Section 1983 against Governor Cuomo and Commissioner Fisher are dismissed.

As to the remaining individual state defendants, there are no allegations that any of them "participated directly in the alleged constitutional violation," (i.e. personally diagnosed, failed to treat K. Doe, or failed to inform him of his diagnosis). Id. at 873. Moreover, aside from Governor Pataki, there is no allegation that any of remaining defendants—the Wardens and Medical Directors of the various state institutions where K. Doe was housed—"created a policy or custom under which unconstitutional practices occurred." Id.; see Compl. ¶ 29 ("NYS; Its Governor, DOCS and its commissioners" created policy). The only possible theory of liability for these remaining DOCS defendants, therefore, is that they "allowed the continuance of . . . a policy or custom" "under which unconstitutional practices occurred." Colon, 58 F.3d at 873; cf. Anderson v. Romano, No. 08 Civ. 00559(JSR)(KNF), 2010 WL 4608675, at *4 (S.D.N.Y. Oct. 22, 2010), adopted by, 2010 WL 4860659 (S.D.N.Y. Nov. 29, 2010) (Rakoff, J.) (granting summary judgment where plaintiff "made no claim that the defendants acted based on a purposefully discriminatory policy" of "fail[ing] to inform him of his hepatitis C infection . . . and fail[ing] to treat it"); McFadden v. Roy, Nos. 03-CV-0931 LEK/DRH, 04-CV0799 LEK/DRH, 2006 WL 2787457, at *3 (N.D.N.Y. Sept. 26, 2006) (report and recommendation adopted by Kahn, J. at *5) (granting motion to dismiss deliberate indifference claim against DOCS officer based on alleged seven-year failure to inform of Hepatitis C diagnosis where plaintiff "fail[ed] to allege any facts regarding what the

polices are or how they related to [defendant's] alleged violations, instead simply stating that these policies exist.").

The fate of plaintiffs' claims, therefore, hinges first on whether the Court finds that the creation and implementation of the alleged statewide policy regarding inmates with Hepatitis is plausible, and second on whether plaintiffs adequately alleged that the remaining defendants were personally involved in either creating the policy or allowing it to continue. The Court will address both issues in turn.

### 1. Plausibility of Policy Allegation

Defendants argue that plaintiff's claims concerning the creation and existence of the alleged Hepatitis policy, "formulated by New York State's highest official with the connivance of DOCS' highest officials . . . [and] implemented through numerous administrations (of different political persuasions and philosophies) . . . for a period of nearly twenty years" are implausible. Defs.' Mot. at 13-14. Defendants argue that plaintiffs' allegations "are all the more implausible" because "DOCS has a long-standing policy concerning the treatment of prisoners with hepatitis that has engendered countless lawsuits by inmates and their advocates." Id. at 14.

Defendants apparently refer to two heavily contested DOCS policies—set forth in the DOCS Primary Care Practice Guidelines (the "Guidelines"), originally formulated in 1999 and revised in 2002, 2004, and most recently, 2005—conditioning and limiting treatment for inmates with symptomatic Hepatitis. Under one policy described by the Second Circuit as the "twelve-month policy," "Hepatitis C treatment [would] not proceed unless an inmate ha[d] [an] anticipated incarceration of at least 12 months." Salahuddin v. Goord, 467 F.3d 263, 271 (2d Cir. 2006) (internal quotation marks omitted). The

apparent justification behind this policy, according to Lester Wright, the DOCS Chief Medical Officer as of 2006, was that "it [wa]s medically important for prisoners to receive a complete course of Hepatitis C treatment" and "there [wa]s no program available to pay for the treatment and monitoring of completion of care of the patient after release." Id. (internal quotation marks omitted). The second contested policy "permit[ted] prison physicians to deny hepatitis C treatment, in certain circumstances, to prisoners who show[ed] evidence of active substance abuse" "within the preceding two years." Johnson v. Wright, 412 F.3d 398, 400-01 (2d Cir. 2005) (citations and quotation marks omitted). "[I]nmates who had a substance abuse history were required to successfully complete or be enrolled in a substance abuse program" prior to receiving treatment for Hepatitis. Motta v. Wright, No. 9:06-CV-1047, 2009 WL 1437589, at *11 (N.D.N.Y. May 20, 2009) (adopting report and recommendation).

The constitutionality of both policies was called into serious doubt by both the Second Circuit and state courts. See, e.g., Salahuddin, 467 F.3d at 281 ("We cannot, as a matter of law, find it reasonable for a prison official to postpone for five months a course of treatment for an inmate's Hepatitis C because of the possibility of parole without an individualized assessment of the inmate's actual chances of parole."); Johnson, 412 F.3d at 404 (vacating and remanding grant of summary judgment because a "jury could . . . reasonably find that the defendants . . . acted with a sufficiently culpable state of mind in mechanically following the [substance abuse] Guideline and refusing to prescribe [inmate Hepatitis medicine]."); McKenna v. Wright, 386 F.3d 432, 437 (2d Cir. 2004) ("[Plaintiff]'s allegation that he was denied urgently needed treatment for a serious disease [(Hepatitis C)] because he might be released within 12 months of starting the

19

treatment sufficiently alleges deliberate indifference to withstand a Rule 12(b)(6) motion."); Domenech v. Goord, 797 N.Y.S.2d 313, 314 ("Denial of medical treatment to . . . prison inmate pursuant to the . . . [substance abuse] policy constituted deliberate indifference to his medical condition in violation of the U.S. Constitution Eighth Amendment."). Accordingly, in 2005, DOCS rescinded and modified both policies. The new Guidelines now allow inmates to begin Hepatitis treatment regardless of their projected release date and provide that inmates' treatment will "be followed after release." Motta, 2009 WL 1437589 at *11. Moreover, rather than "requiring the substance abuse program" as a condition to treatment, "the new Guidelines 'strongly encourage[]' inmates with a history of substance of abuse to complete the program." Id. (citing new Guidelines).

The existence of these two foregoing policies points the Court in the opposite direction urged by defendants. That is, if defendants admittedly promulgated *written* policies which limited or denied altogether Hepatitis treatment for *symptomatic* inmates who *specifically requested* treatment—or, as in several cases, whose treating physicians did so—it is certainly *plausible* that defendants had an unwritten policy to withhold diagnoses and treatment from asymptomatic inmates who did not request testing or treatment.

Additionally, courts in this Circuit have repeatedly declined to dismiss allegations concerning similar instances of failing to inform inmates of their Hepatitis diagnosis over long periods of time, including pursuant to policies nearly identical to those alleged by plaintiffs in this case. See, e.g., Crosby v. O'Connell, No. 9:07-cv-1138 (GLS/DEP), 2010 WL 3909714, at *1-*2 (N.D.N.Y. Sept. 30, 2010) (Sharpe, J.) (denying summary

judgment on claim that DOCS inmate was not informed of Hepatitis C diagnosis nor treated for 10 years "due to a DOCS medical policy that encouraged withholding treatment to inmates with Hepatitis C to avoid costs."); Anderson, 2009 WL 602965 (denying, in part, motion to dismiss DOCS inmate's claim of deliberate indifference of failing to inform him of or treat him for his Hepatitis C diagnosis until he apparently became symptomatic, three years later); McFadden, 2006 WL 2787457 at *2 (denying, in part, motion to dismiss deliberate indifference claim against DOCS officials based on alleged seven year failure (1995-2002) to inform inmate of Hepatitis C infection despite "repeatedly test[ing] positive" in prison); Kaminsky v. Rosenblum, 737 F. Supp. 1309, 1314, 1317 (S.D.N.Y. 1990) (Leisure, J.) (finding "genuine issues of material fact" regarding DOCS's deliberate indifference "relating to the care given to [plaintiff] while he was incarcerated," including repeated "fail[ures] to inform him of his positive hepatitis test[s]" or provide any treatment).

The Court accordingly rejects defendants' plausibility challenge.

### 2. Personal Involvement of Defendants

Although the Court finds, for the preceding reasons, that plaintiffs' allegations regarding the creation and implementation of the alleged Hepatitis policy are indeed plausible, the pleadings lack sufficient information to determine whether or to what extent each of the defendants—with the sole exception of Governor Pataki, who is alleged to have actually created the policy[4]—were personally involved in "allow[ing] the continuance of . . . a policy[,]" "under which unconstitutional practices occurred" to

---

[4] "While liability may not be established against a defendant simply because that defendant was a 'policy maker' at the time unconstitutional acts were committed, where unconstitutional acts are *the result* of a policy promulgated by the defendant, a valid § 1983 action may lie." Brock v. Wright, 315 F.3d 158, 166-67 (2d Cir. 2003) (internal citations omitted) (emphasis in original).

plaintiffs' detriment. Colon, 58 F.3d at 873. This is fatal to plaintiffs' claims against the named DOCS officials in their individual capacities.

Because the complaint fails to specify the facilities at which plaintiff was housed at what time, there is no way of knowing which DOCS defendants implemented the alleged policy as against K. Doe. It would be of no moment in this case, for example, if the Warden of Attica had "allowed the continuance" of the Hepatitis policy in issue at his institution if K. Doe had been transferred from Attica a decade or even a day before its creation. A Warden, Superintendent, or Medical Director's implementation of an unconstitutional policy—separate and apart from any direct impact on K. Doe while housed at a particular facility—is irrelevant to *this* case. What matters is whether defendants "had responsibility for enforcing or allowing the continuation of the challenged policies *that resulted in the denial of [inmate]'s treatment*." McKenna, 386 F.3d at 437 (holding plaintiff adequately pled personal involvement of superintendents and medical directors of DOCS facilities because they were more than "merely linked in the prison chain of command, or faulted for failing to dictate the specific medical treatment of an inmate") (internal citations, quotation marks, and modifications omitted) (emphasis added).

Plaintiffs have not so much as alleged where K. Doe was housed at the time the policy was created, at the time K. Doe was first diagnosed with Hepatitis and later diagnosed with a different strain, or where K. Doe was when released in 2007, let alone the facilities and dates of incarceration prior to the creation of the policy in 1994. Moreover, it is unclear from the pleadings whether the named DOCS officers are those

who were in office during the time period of K. Doe's incarceration or are named solely by virtue of being in office today.

Thus although plaintiffs' claims against Governor Pataki in his individual capacity may proceed based on his alleged role in creating the Hepatitis policy, plaintiffs' claims brought pursuant to Section 1983 against all individually named DOCS officials are dismissed for failure to adequately allege personal involvement under Section 1983.

The fatal flaws identified by the Court may be readily remedied, at least as to some of the individual DOCS defendants. Accordingly, plaintiffs may amend their complaint with respect to these defendants within thirty days of the date of this Order. See Fed. R. Civ. P. 15(a)(2) (leave to amend "should [be] freely give[n] . . . when justice so requires").

### 3. Remaining Claims

In addition to plaintiffs' surviving claims of medical indifference and violations of substantive due process, plaintiffs also allege violations of the Equal Protection Clause of the Fourteenth Amendment, as well as state law claims of medical malpractice, intentional infliction of emotional distress, negligent failure to train, gross negligence, and an assortment of violations of the New York Constitution.

Plaintiffs' claims under the Equal Protection Clause are dismissed because the "complaint fails to allege an 'intent to disadvantage all members of a class that includes plaintiff.'" Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 151 (quoting Crawford-El v. Britton, 523 U.S. 574, 594 (1998)) (emphasis added). The complaint includes no more than conclusory allegations of disparate impact, insufficient to survive a

motion to dismiss. Hayden v. Paterson, 594 F.3d 150, 162-163 (2d Cir. 2010) ("[T]o violate the Fourteenth Amendment 'the disproportionate impact must be traced to a *purpose* to discriminate on the basis of race,'") (quoting Pers. Adm'r of Mass. V. Feeney, 442 U.S. 256, 260 (1979)) (emphasis in original).

The Court declines to dismiss the remaining state law claims at this stage in the proceedings against Governor Pataki, except for the claim of medical malpractice, as only health care professionals can be liable for medical malpractice. Savarese v. Allstate Ins. Co., 731 N.Y.S.2d 226, 227 (N.Y. App. Div. 2001) ("No action to recover damages for medical malpractice arises absent a physician-patient relationship.").

### III. CONCLUSION

For the foregoing reasons, all claims against the State of New York, DOCS, and all state officials in their official capacities are dismissed with prejudice pursuant to Rule 12(b)(1). Plaintiffs' state law claims against DOCS officials in their individual capacities

are also dismissed with prejudice pursuant to Rule 12(b)(1) through the application of New York Correction Law Section 24. All claims against Governor Cuomo and Commissioner Fisher in their individual capacities are dismissed with prejudice pursuant to Rule 12(b)(6). The claims against the DOCS officials in their individual capacities are dismissed without prejudice. The claims against Governor Pataki may proceed to discovery, however, with the exception of the Equal Protection and medical malpractice claims.

SO ORDERED

Dated: Brooklyn, New York
  September 27, 2012

      /s/ Judge Raymond J. Dearie

      RAYMOND J. DEARIE
      United States District Judge