UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
K. DOE,

                 Plaintiff,

        - against -

STATE OF NEW YORK, et al.,

                Defendants.
-------------------------------------------------------- x

**MEMORANDUM & ORDER**

10 CV 1792 (RJD) (VVP)

DEARIE, District Judge

      The claims brought by plaintiff, K. Doe, arise from the alleged creation and implementation—by high-ranking members of the New York State government—of a policy to withhold from state prisoners their positive Hepatitis status and deny treatment as a cost-saving measure. Plaintiff K. Doe alleges that he contracted Hepatitis while incarcerated at various New York state correctional facilities. As a result of defendants' policy, plaintiff alleges that the defendants never informed, counseled, or treated him for his Hepatitis infection, despite the appearance of telltale symptoms of infection in his medical examinations, thereby aggravating his symptoms and causing him to suffer from failing health. Plaintiff now brings a federal law claim under Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, for Eighth Amendment medical indifference. Defendants move to dismiss the complaint in its entirety for failure to state a claim upon which relief may be granted. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

1.  <u>K. Doe's Hepatitis Infection</u>

The pertinent allegations follow. On or about June 6, 1976, plaintiff "K. Doe was convicted of a felony and sentenced to thirty years' imprisonment" in New York State correctional facilities. Third Amended Complaint ¶ 32, ECF Docket # 63. According to plaintiff, he "was not infected with Hepatitis B Virus (hereinafter "HBV") or Hepatitis C Virus (hereinafter "HCV") at the time of the pre-incarceration examination ordered by" the New York State Department of Correctional Services ("DOCS"). [1] <u>Id.</u> ¶ 33.

During plaintiff's incarceration, he was subjected to routine physical and medical examinations at the numerous correctional facilities at which he was held. <u>Id.</u> ¶¶ 35-36. Although initially these examinations indicated that K. Doe was negative for HBV and HCV, by September of 1998, K. Doe alleges that his test results showed telltale symptoms of a Hepatitis infection, such that his doctors either knew or should have known of his likelihood of infection. <u>Id.</u> ¶ 51. However, as a result of defendants' policy, K. Doe alleges that the defendants never informed, counseled, or treated him for his Hepatitis infection. <u>Id.</u> ¶ 73.

K. Doe's physical and medical examinations were conducted by various medical staff at the correctional facilities, to whom K. Doe refers collectively as the "Defendant Treating Physicians." <u>Id.</u> ¶ 29. These Defendant Treating Physicians were in turn overseen by medical supervisors at each correctional facility, who were "charged with maintaining the health of prisoners" at their facilities and "supervising that facility's medical staff." <u>Id.</u> ¶¶ 7-14. K. Doe refers to those medical supervisors collectively as the "Defendant Medical Directors," <u>id.</u> ¶ 15, and includes among them, *inter alia*: (1) defendant Jonathan Curtin, M.D. ("Dr. Curtin"),

---

[1] Effective April 1, 2011, the DOCS and the New York State Division of Parole merged to form the New York State Department of Corrections and Community Supervision ("DOCCS").

medical supervisor at Bare Hill Correctional Facility,[2] id. ¶ 9, and (2) defendant David

O'Connell, M.D., ("Dr. O'Connell"), medical supervisor at Attica Correctional Facility,[3] id. ¶ 7.

Because K. Doe was allegedly kept in the dark as to his condition, he did not discover his

illness until c. April 23, 2008, almost one year after his release from prison, when his private

physician revealed that he suffered from infections with HBV and HCV. Id. ¶ 74. By that point,

the advanced stage of his infection caused K. Doe to suffer failing health. Id. ¶¶ 76, 106.

2.    Defendants' Hepatitis Policy

Aware of the "alarming rates [of] HAV, HBV and HCV infection in the prison

population," K. Doe alleges that certain of the defendants—to whom K. Doe refers collectively

as the "Defendant Policy Makers"—"discussed methods to keep prison HCV rates under

control." Id. ¶ 78. These Defendant Policy Makers include defendant George Pataki ("Governor

Pataki"), former Governor of the State of New York from January 1, 1995 – December 31, 2006,

(2) defendant Brian Fischer, Commissioner of DOCCS[4] ("Commissioner Fischer"),

(3) defendant Anthony Annucci, Executive Deputy Commissioner and Acting Commissioner of

---

[2] K. Doe was incarcerated at Bare Hill Correctional Facility between c. April 11, 1995, and c. March 21, 1996. Id. ¶¶ 9, 43, 45. Prior to his transfer to Bare Hill Correctional Facility, plaintiff alleges that his tests had revealed high levels of the enzyme Transaminase, suggesting liver damage, id. ¶ 40, but he tested negative for HAV, HBV, and HCV, id. ¶ 42. Once at Bare Hill, an unknown medical employee reviewed his medical records and "identified and indicated a likelihood of . . . cirrhosis of the liver and other liver diseases." Id. ¶ 44. However, K. Doe alleges that he was not informed of, counseled on, or treated for this suspected cirrhosis. Id.

[3] K. Doe was incarcerated at Attica Correctional Facility between c. July 16, 1998, and c. November 17, 1998. Id. ¶¶ 7. 48, 52. While there, plaintiff alleges that he was subjected to an interfacility screening assessment, including an Alanine Aminotransferase test, which revealed an elevated level of Alanine Aminotransferase in his bloodstream, an indication of liver disease or infection. Id. ¶ 50. However, K. Doe was not informed of, counseled on, or treated for these high Alanine Aminotransferase levels. Id.

[4] As stated in a memorandum and order of this Court on July 9, 2013, "defendant Fischer, having successfully moved to dismiss all of plaintiff's claims against him with prejudice, is not properly named as a defendant in the Third Amended Complaint and is under no obligation to answer or otherwise respond thereto." K. Doe v. New York, No. 10-CV-1792 (RJD) (VVP), slip op. at 2 (E.D.N.Y. July 9, 2013) [hereinafter K. Doe II].

DOCCS ("Acting Commissioner Annucci"), and (4) defendant Carl Koenigsmann, M.D. ("Dr. Koenigsmann"), Deputy Commissioner and Chief Medical Officer of DOCCS. Id. ¶¶ 2-6.

As a result of these discussions, K. Doe alleges that the Defendant Policy Makers "in or about 1994, affirmatively decided to ignore staggering [Hepatitis] infection rates to save money because of the enormous costs of treating these inmates." Id. ¶ 83. The Defendant Policy Makers subsequently initiated and enforced, or allowed to continue, a policy that "allowed infected prisoners to remain anonymous with their infections undisclosed and hidden, treating only those who discovered their affliction through obvious symptoms, or those who discovered their ailments as a result of their affirmative request to be tested." Id. ¶ 89. Defendants are alleged to have continued this policy until 2005, when the Second Circuit held that constitutional claims for medical mistreatment could arise from a separate, publicly known New York State correctional facility Hepatitis guideline that denied HCV treatment to prisoners up for parole within the next twelve months. Id. ¶ 83; see also McKenna v. Wright, 386 F.3d 432, 437-38 (2d Cir. 2004)).

## PROCEDURAL HISTORY

This action was originally brought on behalf of K. Doe and R. Doe, a woman who was infected with Hepatitis by K. Doe through consensual sex upon his release from prison. Complaint, ECF Docket # 1 ¶ 19. Plaintiff filed his original complaint (the "Original Complaint") almost two years after discovering his Hepatitis, on April 22, 2010. Id. The Original Complaint named four defendants: (1) the state of New York, (2) David Patterson, in his capacity as Governor of the State of New York, (3) DOCS, and (4) Brian Fischer, in his capacity as Commissioner of DOCS. Id. The first amended complaint (the "First Amended Complaint") was filed six months later and included numerous John Doe medical directors and treating physicians for the various correctional facilitates at which plaintiff was incarcerated. ECF

4

Docket # 14. Days later, on October 18, 2010, the plaintiff moved to serve the John Doe defendants via substituted service, noting that although he had "diligently sought medical records . . . that would clearly indicate the name of the treating physician[s]," he had not yet received those records. ECF Docket # 15. On October 21, 2010, Magistrate Judge Viktor V. Pohorelsky denied this motion but assured the plaintiff that he would "be given adequate time to effectuate service once the medical records [we]re produced which identif[ied] the names of the various personnel . . . named as John and Jane Does." ECF Docket # 17. Towards the end of 2010, plaintiff was provided with the medical records from his incarceration and, as noted in a meeting with Magistrate Judge Pohorelsky on December 22, 2010, reviewed the "medical records in an effort to identify the specific individuals." ECF Docket # 19. Meanwhile, the defendants were instructed, "to the extent possible, [to] assist in providing the names of persons whom the medical records disclose as providing care but whose identities cannot be ascertained due to illegibility or other similar reasons." Id. The parties continued to meet with Magistrate Judge Pohoreslky and work to identify the remaining defendants, ECF Docket # 20, until March 4, 2011, about a month and a half before the statute of limitations ran, when plaintiff filed the second amended complaint (the "Second Amended Complaint"), removing all of the John Does and adding named parties, ECF Docket # 21.

On August 23, 2011, various defendants named in the Second Amended Complaint moved to dismiss the complaint on the grounds that, *inter alia*: (1) venue was improper, (2) the Court lacked subject matter jurisdiction over plaintiffs' claims against the State of New York, DOCS, and state officials in their official capacities, (3) plaintiffs had not sufficiently alleged the plausibility of the claim that there was such a Hepatitis policy, and (4) plaintiffs had not sufficiently plead the personal involvement of the defendants. ECF Docket # 37-38.

In a memorandum and order dated September 27, 2012, this Court dismissed all of the defendants, with the exception of Governor Pataki. K. Doe v. New York, No. 10-CV-1792 (RJD) (VVP), 2012 WL 4503409 (E.D.N.Y. Sept. 28, 2012) [hereinafter K. Doe I]. In so doing, this Court held that, *inter alia*: (1) plaintiffs had sufficiently alleged the plausibility of the claim that there was such a Hepatitis policy, id. at *11, and (2) the claims against Governor Pataki could proceed based on his alleged role in creating the Hepatitis policy, id. at *12.

After a few extensions, plaintiff filed the Third Amended Complaint late, on May 24, 2013. ECF Docket # 63. Nonetheless, this Court accepted the Third Amended Complaint for filing and designated it as the operative complaint in this action. K. Doe II, at 1-2. Acting Commissioner Annucci and Dr. Koenigsmann were served with the Third Amended Complaint on August 19, 2013. Two unnamed defendants, a "Dr. Augustin" and "Dr. Sheikh," were served on August 18, 2013, and August 22, 2013, respectively.

On November 27, 2012, defendants again moved under Rule 12(b)(6) to dismiss the Third Amended Complaint in its entirety, arguing that (1) plaintiff has not sufficiently alleged the plausibility of the claim that there was such a Hepatitis policy, (2) plaintiff has not sufficiently plead the personal involvement of Governor Pataki, Dr. Curtin, and Dr. O'Connell, and (3) plaintiff's claims against Acting Commissioner Annucci, Dr. Koenigsmann, Dr. Augustin, and Dr. Sheikh are barred by the statute of limitations.

## DISCUSSION

1.   Motion to Dismiss – Failure to State a Claim

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Brown v. Daikin Am. Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007)). In reviewing the complaint, this Court "accept[s] all well-pleaded allegations in the complaint as true [and] draw[s] all reasonable inferences in the plaintiff's favor." Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Com'n, 768 F.3d 183, 191 (2d Cir. 2014) (second alteration in original). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). However, where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Twombly, 550 U.S. at 570.

In order to succeed in a claim under Section 1983, "a plaintiff must show that (1) the conduct complained of was committed by a person acting under color of state law, and (2) this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." Greenwich Citizens Comm., Inc. v. Cntys. of Warren & Wash. Indus. Dev. Agency, 77 F.3d 26, 29-30 (2d Cir. 1996) (internal quotations omitted) (quoting Parratt v. Taylor, 451 U.S. 527, 535 (1981)). "The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 832, 844 (1994)). To state a claim of medical mistreatment under Section 1983, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). The deliberate indifference standard requires *both* an objective element, that "the alleged deprivation of adequate medical care [is] 'sufficiently serious,'" *and* a subjective element, that "the charged official . . . act[s] with a sufficiently culpable state of mind." Salahuddin, 467 F.3d at 279-280 (finding a lapse sufficiently serious where a prison official postponed treatment for an inmate's HCV for five

months, but concluding that the prison official lacked a sufficiently culpable state of mind, because he was not aware of the risk to the inmate's health).

Additionally, "supervisor liability in a [Section] 1983 claim depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*." Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003). Prior to Iqbal, the Second Circuit held that this supervisor liability could be shown through:

> (1) actual direct participation in the constitutional violation,
> (2) failure to remedy a wrong after being informed through a report or appeal,
> (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue,
> (4) grossly negligent supervision of subordinates who committed a violation, or
> (5) failure to act on information indicating that unconstitutional acts were occurring.

Id. at 145 (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)). Importantly, for the third Colon avenue of supervisory liability, "it is not sufficient that such a policy or practice continued to exist during defendant's tenure; defendant must have known of it as well." K & A Radiologic Tech. Services, Inc. v. Comm'r of the Dep't. of Health of the State of New York, 189 F.3d 273, 278 (2d Cir. 1999); see also McKenna, 386 F.3d at 437 (finding sufficient personal involvement for medical defendants, all "alleged to have participated in the denial of treatment," as well as non-medical defendant superintendents, alleged to have known of the denial of treatment through grievances and "adequately alleged to have had responsibility for enforcing or allowing the continuation of the challenged policies that resulted in denial of [the inmate]'s treatment"); Brock v. Wright, 315 F.3d 158, 165-66 (2d Cir. 2003) ("While liability may not be established against a defendant simply because that defendant was a 'policy maker' at the time unconstitutional acts were committed, . . . where unconstitutional acts are *the result* of a policy promulgated by the defendant, a valid [Section] 1983 action may lie.") (emphasis in original).

In Iqbal, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to . . . [S]ection 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676. Accordingly, some courts in this Circuit have found that Iqbal abrogated all of the Colon categories except for the first and either all or part of the third. See, e.g., Bellamy v. Mount Vernon Hosp., No. 07-CV-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) (Scheindlin, J.), aff'd, 387 Fed.Appx. 55 (2d Cir. 2010) ("Only the first and *part* of the third Colon categories pass Iqbal's muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor *creates* a policy or custom under which unconstitutional practices occurred.") (emphasis added); cf. Butler v. Suffolk Cnty., 289 F.R.D. 80, 94 (E.D.N.Y. 2013) (Seybert, J.) ("[A] supervisory official can . . . be held liable if he 'participated directly in the alleged constitutional violation [or] . . . *created* a policy or custom under which the unconstitutional practices occurred, *or allowed the continuance of* such a policy or custom.'") (emphasis added) (second alteration in original). Following this line of reasoning, in K. Doe I, this Court agreed that "only the First and Third of the Colon avenues of supervisory liability . . . survive Iqbal," but did not reach whether the Third Colon avenue of supervisory liability survived in whole or in part. 2012 WL 4503409, at *8 n.3.

Subsequent case law in this Circuit has generated further confusion on the issue, however, with the majority of courts emphasizing that, "neither the Second Circuit nor the Supreme Court has endorsed this reading of Iqbal," and therefore finding that "unless or until the Second Circuit or Supreme Court rule otherwise, . . . [all five of] the Colon

factors 'still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated.'" Cano v. City of New York, -- F. Supp. 3d --, No. 13-CV-3341, 2014 WL 4494169, at *10 (E.D.N.Y. Sept. 12, 2014) (Kuntz, II, J.) (quoting Phillip v. Schriro, No. 12–CV–8349, 2014 WL 4184816, at *4 (S.D.N.Y. Aug. 22, 2014) (Abrams, J.)); cf. Turkmen v. Ashcroft, 915 F. Supp. 2d 314, 336 (E.D.N.Y. 2013) (Gleeson, J.) ("What is different after Iqbal is that the guiding question is no longer simply whether a plaintiff has pleaded personal involvement under Colon but whether a plaintiff has pleaded each of the elements of the constitutional tort alleged.").

This Court remains skeptical that all five of the Colon factors survive under Iqbal. However, unless or until the Second Circuit or Supreme Court rule otherwise, this Court finds that at least the first and third Colon avenue for supervisory liability survive in their entirety.[5]

Just as in K. Doe I, therefore, the fate of plaintiff's Section 1983 claim, "hinges first on whether the Court finds that the creation and implementation of the alleged statewide policy regarding inmates with Hepatitis is plausible, and second on whether plaintiffs adequately

---

[5] In determining that the third Colon factor survives in its entirety, this Court is persuaded by the reasoning of Judge Gleeson in Turkmen that "Iqbal removed supervisory liability from Bivens claims," but "the demise of supervisory liability in Bivens claims does not mean that the forms of personal involvement under Colon can never constitute a basis for *direct* liability." 915 F. Supp. 2d at 336 (emphasis in original). Rather, Judge Gleeson held that "[i]f a defendant's personal involvement under Colon satisfies the elements of a constitutional tort, that involvement may trigger liability." This reasoning is less persuasive for some of the more passive Colon factors, such as two and five, both of which involve a failure to act. However, this Court sees no reason why a hypothetical complaint could not plausibly allege that a government official took such an active role in allowing the continuance of an improper policy or custom so as to meet the personal involvement requirement for supervisory liability under Section 1983, post-Iqbal.

alleged that the defendants were personally involved in either creating the policy or allowing it to continue. The Court will address both issues in turn." 2012 WL 4503409, at *9.

### A. Plausibility of the Claim that there was Such a Hepatitis Policy

Defendants argue that plaintiff K. Doe has not sufficiently alleged the plausibility of the claim that the purported Hepatitis policy existed. Although this Court previously rejected this argument, defendants claim that law of the case does not bar this Court from hearing this argument because the Hepatitis policy, as alleged in the Second Amended Complaint, differs substantially from the Hepatitis policy, as alleged in the Third Amended Complaint.

Under the "law of the case" doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983); see also United States v. Carr, 557 F.3d 93, 102 (2d Cir. 2009). "Law of the case directs a court's discretion, it does not limit the tribunal's power." Id.; see also Rezzonico v. H & R Block, Inc., 182 F.3d 144, 149 (2d Cir. 1999) ("The doctrine expresses, in shorthand fashion, a practice of courts generally not to reconsider that which has already been decided. But it does not purport to be a legally binding limitation on the court's authority to reconsider such matters."). However, "[a] court's reconsideration of its own earlier decision in a case" requires "compelling circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." Carr, 557 F.3d at 102. For example, a court in this Circuit has found that the law of the case doctrine did not control where an amended complaint, regarding alleged interference by the DOCS with plaintiff prisoner's legal mail, contained "materially different and more detailed claims" than the original complaint. See Bellezza v.

Holland, No. 09-CV-8434 (RWS), 2011 U.S. Dist. LEXIS 76030, at *6 (S.D.N.Y. July 11, 2011).

In the Second Amended Complaint, the plaintiff alleged merely that "testing" during "routine physical and medical examinations" at the correctional facilities, "*revealed* to DOCS that K. Doe was infected by HCV," but "DOCS did not inform K. Doe of his HCV infection and did not counsel or treat" him for it. Second Amended Complaint ¶ 26 (emphasis added). In the Third Amended Complaint, the plaintiff alleged with greater detail the circumstances surrounding the correctional facilities' neglect to treat his Hepatitis infections, explaining that he was subjected to a variety of tests during his examinations, the results of which should have put the doctors on notice that he was infected with HBV and HCV, and yet the doctors never advised him of this infection. Third Amended Complaint ¶¶ 50-73. Defendants therefore argue that the Hepatitis policy, as alleged in the Second Amended Complaint, differs substantially from the Hepatitis policy, as alleged in the Third Amended Complaint.

Defendants characterize the difference between these two sets of allegations as such: (1) the allegations in the Second Amended Complaint suggested K. Doe had been diagnosed with HBV and HCV and that, despite this diagnosis, the doctors failed to inform, counsel, or treat him for these infections, whereas (2) the allegations in the Third Amended Complaint weaken that claim, by specifying that the doctors merely knew or should have known, from telltale symptoms in K. Doe's test results, that he was infected with HBV and HCV and that, despite this knowledge, the doctors failed to inform, counsel, or treat him for these infections.

Defendants' argument, however, is based on a false distinction. Black's Law Dictionary defines "diagnosis" as "[t]he determination of a medical condition (such as a disease) *by physical examination or by study of its symptoms*" or "the result of such an examination or study."

12

Black's Law Dictionary 548 (10th ed. 2014) (emphasis added). Therefore, although a specific test result indicating a Hepatitis infection would certainly assure a doctor that their diagnosis of Hepatitis was correct, according to the word's very definition, clear indicia of a Hepatitis infection in the form of telltale symptoms could also serve as the basis for a diagnosis.

Therefore, this Court is not convinced that the difference between the Hepatitis policy, as alleged in the Second Amended Complaint, and the Hepatitis policy, as alleged in the Third Amended Complaint, is compelling enough to warrant a revisiting of the plausibility of the claim that there was such a Hepatitis policy. However, even if this Court exercised its discretion to review the plausibility issue, this Court's decision remains the same.

Defendants argue that the alleged failure of individual doctors to inform, counsel, or treat K. Doe for the Hepatitis infections suggested by his test results does not lead to the conclusion that Governor Pataki instituted a state-wide policy whereby inmates would be left intentionally in the dark as to their Hepatitis status. First of all, this characterization of the Hepatitis policy is overly narrow. Plaintiff does not allege that Governor Pataki, alone, instituted the Hepatitis policy. Rather, he states that the Defendant Policy Makers, as a group, "decided to ignore" the Hepatitis infection rates in the New York State correctional facilities, in order to "save money" on treatment of inmates, a decision which then trickled down into the medical centers at the correctional facilities. Id. ¶ 83.

Second, the defendants' emphasis on the difference between a doctor failing to share an affirmative Hepatitis diagnosis and a doctor failing to investigate further when a prisoner presented with clear indicia of infection but had not been tested turns more on the *mens rea* of the doctors who knew or should have known about K. Doe's Hepatitis infection than it does on the plausibility of the claim that there was a Hepatitis policy that "allowed infected prisoners to

remain anonymous with their infections undisclosed and hidden, treating only those who discovered their infection through obvious symptoms, or those who discovered their ailments as a result of their affirmative request to be tested." Id. ¶ 89. In fact, if such a policy did exist, it seems clear to this Court that the policy would *both* discourage doctors from sharing an affirmative diagnosis *and* from investigating further, without a specific request from the prisoner.

Finally, as stated in K. Doe I, "courts in this Circuit have repeatedly declined to dismiss allegations concerning similar instances of failing to inform inmates of their Hepatitis diagnosis over long periods of time, including pursuant to policies nearly identical to those alleged by plaintiff[] in this case." 2012 WL 4503409, at *11 (collecting cases). This Court does not find defendants' parsing of the levels of diagnostic certainty to be a convincing distinction from that precedent.

Accordingly, the Court rejects defendants' challenge to the plausibility of the claim that there was such a Hepatitis policy.

### B. *Personal Involvement of Defendants*

Defendants further argue that plaintiff K. Doe has not sufficiently plead the personal involvement of Governor Pataki, Dr. Curtin, and Dr. O'Connell.

#### i. Governor Pataki

Defendants argue that plaintiff has not sufficiently alleged the requisite personal involvement for the supervisor liability of Governor Pataki because the Third Amended Complaint claims that the Hepatitis policy was created "in or about 1994," ¶ 83, but states that Governor Pataki did not take office until January 1, 1995, ¶ 2. Plaintiff K. Doe counters in two parts, arguing that: (1) this Court decided that Governor Pataki's personal involvement was sufficiently alleged in K. Doe I and law of the case bars reconsideration of this issue; and

14

(2) even if the Court were to revisit its decision on Governor Pataki's personal involvement, (a) the Third Amended Complaint sufficiently alleges that Governor Pataki participated in the *creation* of the Hepatitis policy, because the language "in or about 1994" includes 1995, or, in the alternative (b) the Third Amended Complaint sufficiently alleges that Governor Pataki *allowed the continuance* of the Hepatitis policy.

Defendants, in turn, argue that: (1) law of the case does not bar the Court from reconsideration because, in K. Doe I, this Court found that the claims against Governor Pataki could proceed based on his alleged role in *creating* the Hepatitis policy, whereas the Court is now being asked to find that plaintiff plead sufficient personal involvement for Governor Pataki's alleged role in *allowing the continuance* of the Hepatitis policy; and (2) the Third Amended Complaint does not sufficiently allege that Governor Pataki was even aware of the existence of the Hepatitis policy, much less that he was personally involved in allowing the policy to continue.

As an initial matter, this Court is not sympathetic to defendants' claims that plaintiff's inclusion of the timing of Governor Pataki's term of office in the Third Amended Complaint constitutes compelling new evidence sufficient for this Court to exercise its discretion to reconsider its earlier decision that plaintiff sufficiently alleged Governor Pataki's personal involvement in the creation of the Hepatitis policy. The assertion that the Hepatitis policy was created "in or about 1994" was included in the Second Amended Complaint, ¶ 30, and the timing of Governor Pataki's term of office was *easily* available to the defendants at the time they briefed their motion to dismiss that complaint in K. Doe I. Indeed, the Court already dismissed two defendants in this case because the timing of their terms of office made it implausible that they created or

15

participated in the continuance of the Hepatitis policy, despite the fact that their terms of office were not alleged in the operative complaint. See K. Doe I, 2012 WL 4503409, at *9 (dismissing claims against Governor Cuomo and Commissioner Fischer).

However, even if this Court exercised its discretion to review Governor Pataki's personal involvement, this Court's decision remains the same, for two reasons. First, this Court rejects defendant's contention that the Third Amended Complaint's unartful use of "in or about 1994" prohibits this Court from finding that Governor Pataki was sufficiently alleged to have been involved in the creation of the Hepatitis policy. As the complaint states, Governor Pataki took office on January 1, 1995. Third Amended Complaint ¶ 2. Certainly, it does not distort the English language to find that "in or about 1994" encompasses the first few days or even months of 1995.

Second, even if Governor Pataki was not involved in the *creation* of the Hepatitis policy, plaintiff has alleged that the Defendant Policy Makers held meetings to discuss "methods to keep prison HCV rates under control," id. ¶ 78, and "discussed the price of mass treatment and preventative measures in the prison system" in "various meetings and memoranda between 1993 and 1995," id. ¶ 79. Accepting these allegations as true, it is certainly plausible that Governor Pataki was advised of the Hepatitis policy in one of these meetings and, agreeing with its cost benefit analysis, decided to *allow the continuance* of the policy. See, e.g., K & A Radiologic Tech. Services, 189 F.3d at 278; McKenna, 386 F.3d at 437; Brock, 315 F.3d at 165-66.

Therefore, plaintiff's claims against Governor Pataki in his individual capacity may proceed, for the moment at least, based on his alleged role in creating (or allowing the continuance of) the Hepatitis policy.

ii. Dr. Curtin and Dr. O'Connell

Defendants next argue that plaintiff has not sufficiently alleged the personal involvement for the supervisor liability of Dr. Curtin and Dr. O'Connell because the Third Amended Complaint is devoid of allegations that these doctors were somehow involved in the creation or implementation of a policy to withhold from plaintiff his Hepatitis infection status, as well as any allegation that plaintiff was even diagnosed with Hepatitis while under these doctors' medical supervision.

As discussed above, the defendants' emphasis on the difference between a doctor failing to share an affirmative Hepatitis diagnosis and a doctor failing to investigate further when a prisoner presented with clear indicia of infection but had not been tested is not relevant here. Therefore, this Court does not find it lethal to K. Doe's claims against Dr. Curtin and Dr. O'Connell that he was never affirmatively diagnosed with Hepatitis while incarcerated at their correctional facilities.

However, defendants are correct that neither doctor is alleged to have treated K. Doe directly. Instead, each is alleged to have been the "medical supervisor charged with maintaining the health of prisoners of [their respective correctional facilities] and supervising that facility's medical staff." Id. ¶¶ 7, 9. And though this Court sees reason in plaintiff's argument that the implementation of the Hepatitis policy alleged in this case at correctional facilities would pass to the treating physicians through the medical supervisors at each facility, this Court agrees that the Third Amended Complaint is devoid of allegations that Dr. Curtin and Dr. O'Connell were personally involved in the implementation of any such policy.

During his incarceration at each of the two doctors' correctional facilities, plaintiff has alleged at least some facts that would suggest that he presented symptoms that indicated serious

liver issues, including, possibly, Hepatitis, and the treating physicians at those correctional facilities failed in any way to investigate further or inform plaintiff of the issue. Specifically, plaintiff alleges that while he was incarcerated at Dr. Curtin's correctional facility, Bare Hill, an unknown medical employee reviewed his medical records and "identified and indicated a likelihood of . . . cirrhosis of the liver and other liver diseases." Id. ¶ 44. However, K. Doe alleges that he was not informed of, counseled on, or treated for this suspected cirrhosis. Id. Additionally, Plaintiff alleges that while he was incarcerated at Dr. O'Connell's correctional facility, Attica, he was subjected to an interfacility screening assessment, including an Alanine Aminotransferase test, which revealed an elevated level of Alanine Aminotransferase in his bloodstream, an indication of liver disease or infection. Id. ¶ 50. Again, K. Doe alleges that he was not informed of, counseled on, or treated for these high Alanine Aminotransferase levels. Id.

However, these allegations go to the personal involvement of the treating physicians that Dr. Curtin and Dr. O'Connell supervised. The allegations in the Third Amended Complaint that Dr. Curtin and Dr. O'Connell, in their role as medical supervisors, indifferently or intentionally enforced the Hepatitis policy at their facilities, is conclusory. Id. ¶ 86. Plaintiff K. Doe does not identify with any particularity that Dr. Curtin and Dr. O'Connell personally knew about the Hepatitis policy, or encouraged its implementation at their correctional facilities, much less that they were aware of K. Doe's symptoms and were deliberately indifferent to his medical needs. See, e.g., K & A Radiologic Tech. Services, 189 F.3d at 278 ("For the requisite personal involvement to be found, . . . it is not sufficient that such a policy or practice continued to exist during defendant's tenure; defendant *must have known of it as well*.") (emphasis added); see also, McKenna, 386 F.3d at 437 (finding sufficient personal involvement for medical defendants, all "alleged to have participated in the denial of treatment," as well as non-medical defendant

superintendents, alleged to have known of the denial of treatment through grievances and "adequately alleged to have had responsibility for enforcing or allowing the continuation of the challenged policies that resulted in denial of [the inmate]'s treatment"). If these allegations were sufficient, it could create the possibility of Section 1983 liability for prison medical supervisors any time there was a failure to diagnose an inmate. "That result would defeat the Second Circuit's strict requirement of personal involvement as a prerequisite for [Section] 1983 liability." Johnson v. Abate, No. 93-CV-1134 (JG), 1999 WL 1215560, at *5 (E.D.N.Y. Dec. 2, 1999) (citing Colon, 58 F.3d at 874 ("The bare fact that [defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim.")).

Therefore, plaintiff's claims against Dr. Curtin and Dr. O'Connell are dismissed for failure to adequately allege personal involvement under Section 1983.

2.    Statute of Limitations – Relation Back

Finally, defendants argue that the claims against Acting Commissioner Annucci, Dr. Koenigsmann, Dr. Augustin, and Dr. Sheikh (together, the "Newly-Named Defendants"), are barred by the statute of limitations.

"The statute of limitations for claims brought under Section 1983 is governed by state law, and in this case is the three-year period for personal injury actions under New York State law." Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009) (applying three year statute of limitations to an Eighth Amendment claim alleging a policy of deliberate indifference to serious medical needs); see also Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013). Plaintiff alleges that he first learned that he suffered from HBV and HCV from his private physician on or

about April 23, 2008.[6] Third Amended Complaint ¶ 74. Therefore, the statute of limitations ran

on April 23, 2011. All of the Newly-Named Defendants were named as John or Jane Doe

defendants in the earlier iterations of the complaint and were served in August of 2013.[7]

Plaintiff does not contest that the Newly-Named Defendants were served after the statute

of limitations had run but argues that the Third Amended Complaint meets the requirements for

the "relation back" of claims set forth under Rule 15(c) of the Federal Rules of Civil Procedure.

A. *Plaintiff's Claims are Untimely under Federal Law*

Federal Rule of Civil Procedure "15(c)(1)(C) provides the federal standard for relation

back." Hogan, 738 F.3d at 517. Under relation back, an amended complaint adding a new party

is deemed to relate back to the date of the original pleading when each of the following factors is

met:

> (1) the claim must have arisen out of conduct set out in the original pleading;
> (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense;
> (3) that party should have known that, *but for a mistake of identity*, the original action would have been brought against it; and . . .
> [4] the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and . . . the original complaint [was] filed within the limitations period.

---

[6] The date that defendants provided, March 12, 2008, was the date that K. Doe's physician diagnosed him with chronic cirrhosis of the liver, but the physician did not inform K. Doe of his Hepatitis infection until the following month. Third Amended Compl. ¶ 74.

[7] Curiously, plaintiff's brief only refers to Dr. Augustin and Dr. Sheikh, when making the relation back argument. Even more curious, however, is the fact that neither Dr. Augustin nor Dr. Sheikh are named in the Third Amended Complaint. These doctors are apparently two of the John or Jane Doe Defendant Medical Directors, whose identities were not known at the time the complaint was filed. See Transcript of Oral Argument at 20-21, K. Doe v. New York, No. 10-CV-1792 (E.D.N.Y. July 2, 2014), ECF Docket # 99. It is unclear how plaintiff expects this Court to hold that relation back could apply to two defendants who are not named in the amended pleadings. However, as discussed further below, relation back could not keep these two doctors in this case, even if they were named in the Third Amended Complaint.

Id. (emphasis in original) (quoting Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 468-69 (2d Cir. 1995)). Here, the defendants argue that plaintiff cannot meet the third requirement for relation back because "although Rule 15(c)(1)(C) explicitly allows the relation back of an amendment due to a 'mistake' concerning the identity of the parties ... [,] the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." Id. at 517-18 (internal quotations omitted) (quoting Barrow, 66 F.3d at 470). They are correct.

Put simply, "lack of knowledge of a John Doe defendant's name does not constitute a 'mistake of identity.'" Id. at 518, (quoting Barrow, 66 F.3d at 470); see also Ceara v. Deacon, -- F.Supp.3d --, No. 13–CV–6023 (KMK), 2014 WL 6674559, at *4 (S.D.N.Y. Nov. 25, 2014) (concluding that the plaintiff's claims did not relate back under Rule 15(c)(1)(C) because the plaintiff was "ignorant" and not "mistaken" about the John Doe defendants' identities); Strada v. City of New York, No. 11–CV–5735 (MKB), 2014 WL 3490306, at *10 (E.D.N.Y. July 11, 2014) (citing Hogan and explaining that "Barrow remains good law ... and precludes [the] [c]ourt from finding that [the] [p]laintiff's failure to amend the [c]omplaint to name the individual officers was a mistake contemplated by Rule 15(c)"). Therefore, plaintiff's claims in the Third Amended Complaint against the Newly-Named Defendants cannot relate back to the original pleading under Rule 15(c)(1)(C). See Hogan, 738 F.3d at 518.

B. *Plaintiff's Claims are Untimely under State Law*

However, even where a plaintiff's claims do not relate back under Rule 15(c)(1)(C), the Second Circuit has held that "Rule 15(c)(1)(A) permits an amended pleading to relate back when 'the law that provides the applicable statute of limitations allows relation back.'" Id. (quoting Fed.R.Civ.P. 15(c)(1)(A)). As stated earlier, the statute of limitations for claims brought under

Section 1983 is governed by state law, and in <u>Hogan</u>, the Second Circuit explained that New York state law "provides a 'more forgiving principle of relation back' in the John Doe context, compared to the federal relation back doctrine under Rule 15(c)(1)(C)." <u>Id.</u> Under § 1024 of the New York Civil Practice Law and Rules ("CPLR"), a complaint relates back where: (1) the plaintiff "exercise[d] due diligence, prior to the running of the statute of limitations, to identify the defendant by name"; and (2) the plaintiff "describe[d] the John Doe party in such form as will fairly apprise the party that [he] is the intended defendant." <u>Id.</u> at 519 (internal quotations and citations omitted).

Under CPLR § 1024, due diligence "requires that a plaintiff 'show that he or she made timely efforts to identify the correct party before the statute of limitations expired.'" <u>Ceara</u>, 2014 WL 6674559, at *6 (quoting <u>Strada,</u> 2014 WL 3490306, at *5). Here, plaintiff cannot satisfy that due diligence requirement, as he failed to act with due diligence in identifying the John Doe Defendants prior to the filing of the Third Amended Complaint, much less prior to the running of the statute of limitations. <u>Hogan</u>, 738 F.3d at 519; <u>see also</u> <u>JCG v. Ercole</u>, No. 11-CV-6844 (CM) (JLC), 2014 WL 1630815, at *14 (S.D.N.Y Apr. 24, 2014) (finding lack of due diligence where, in the three years he had to discover the unknown parties, plaintiff waited until the last minute to submit multiple discovery requests and failed to promptly seek further discovery); <u>Temple v. New York Cmty. Hosp. of Brooklyn</u>, 89 A.D.3d 926, 927-928, 933 N.Y.S.2d 321, 322 (2d Dept. 2011) (concluding that "the plaintiff failed to exercise due diligence" in part, because when the responses to "some limited discovery demands" were "less than adequate, the plaintiff failed to promptly seek further discovery . . . and failed to properly and promptly seek assistance from the [New York] Supreme Court"); cf. <u>Hogan</u>, 738 F.3d at 519 (determining that the plaintiff met first requirement under § 1024 because he "diligently sought to identify" John Doe defendants by

submitting "multiple discovery requests to the Attorney General's office"); Ceara, 2014 WL 6674559, at *7 (finding due diligence requirement satisfied where plaintiff wrote to the Inspector General, requesting the full names of the defendants, and received no response).

As discussed in more detail under "Procedural History" above, the docket reflects the drawn out nature of this action. Plaintiff has amended the complaint three times since he originally filed it in April of 2010, almost two years after discovering his Hepatitis. Original Complaint, ECF Docket # 1, First Amended Complaint, ECF Docket #14, Second Amended Complaint, ECF Docket # 21, Third Amended Complaint, ECF Docket # 63. Throughout these amendments, the parties were well aware of the need to identify the unknown treating physicians and medical supervisors. On October 18, 2010, between filing the First and Second Amended Complaints, plaintiff moved to serve the John Doe defendants via substituted service, noting that although he had "diligently sought medical records . . . that would clearly indicate the name of the treating physician[s]," he had not yet received those records. ECF Docket # 15. On October 21, 2010, Magistrate Judge Viktor V. Pohorelsky denied this motion but assured the plaintiff that he would "be given adequate time to effectuate service once the medical records [we]re produced which identif[ied] the names of the various personnel . . . named as John and Jane Does." ECF Docket # 17. Towards the end of 2010, plaintiff was provided with his medical records and, as noted in a meeting with Magistrate Judge Pohorelsky on December 22, 2010, reviewed the "medical records in an effort to identify the specific individuals." ECF Docket # 19. Meanwhile, the defendants were instructed, "to the extent possible, [to] assist in providing the names of persons whom the medical records disclose as providing care but whose identities [could not] be ascertained due to illegibility or other similar reasons." Id. The parties continued to meet with Magistrate Judge Pohoreslky and work to identify the remaining defendants, ECF Docket # 20,

23

until March 4, 2011, about a month and a half before the statute of limitations ran, when plaintiff filed the Second Amended Complaint, removing all of the John Does and adding some named parties. ECF Docket # 21.

In September of 2012, this Court dismissed all of the claims in the Second Amended Complaint, except those against Governor Pataki, in his individual capacity, and gave plaintiff thirty days to amend. K. Doe I, 2012 WL 4503409, at *12. After a few extensions, plaintiff filed the Third Amended Complaint late, on May 24, 2013. ECF Docket # 63. The Newly-Named Defendants, two of whom actually remain as John Does in the Third Amended Complaint, were not served until August of 2013, almost two and a half years after the statute of limitations had run and almost two years after plaintiff had received his medical records.

Given the above procedural history, plaintiff's arguments that he was unable to read some of the names in the medical records and had other difficulties identifying the treating physicians and medical supervisors therein are unavailing. If that were the case, plaintiff should have reached out to the defendants or this Court for assistance. See, e.g, Temple, 89 A.D.3d at 927-28 (concluding that "the plaintiff failed to exercise due diligence" in part, because when the responses to "some limited discovery demands" were "less than adequate, the plaintiff failed to promptly seek further discovery . . . and failed to properly and promptly seek assistance from the [New York] Supreme Court"). Instead, plaintiff filed the Second Amended Complaint with all John Does removed, thereby signaling to this Court and to the defendants that the requisite parties had been identified.

Nor is this Court persuaded of plaintiff's diligence by his claims to have written letters to each correctional facility, addressed to the John or Jane Does he sought to identify. This claim is only substantiated by a letter regarding the John Does one of the correctional facilities, from fall

of 2013, written to plaintiff in response to his sending that facility a summons and copy of the Third Amended Complaint. See Exhibit C to Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss, K. Doe v. New York, No. 10-CV-1792 (E.D.N.Y. Dec. 23, 2013), ECF Docket # 101-3. Even assuming that such letters were sent to the correctional facilities of all of the John and Jane Does in the Third Amended Complaint, their delivery in mid-2013 hardly shows diligence on the part of the plaintiff, who could easily have sent letters requesting the identities of these unnamed defendants back in late 2010 and early 2011, once plaintiff received a copy of his medical records. Accordingly, this Court finds that plaintiff has not met the due diligence requirement for his claims against the Newly-Named Defendants in the Third Amended Complaint to relate back under CPLR § 1024.

Finally, plaintiff cannot rely on New York's relation-back doctrine, set forth in CPLR § 203. New York courts allow claims against a new defendant to "relate back to timely filed pleadings," under CPLR § 203 when:

> (1) the new claim arose out of the same conduct, transaction or occurrence as the original allegations; (2) the new party is united in interest with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and (3) the new party knew or should have known that, but for a mistake as to the identity of the proper parties, the action would have been brought against him as well.

Strada, 2014 WL 3490306, at *6 (quoting JCG, 2014 WL 1630815, at *15). "New York courts have held, however, that a plaintiff may not add a new defendant," under CPLR § 203 "unless 'the new party knew or should have known that, but for an *excusable mistake* by plaintiff as to the identity of the proper parties, the action would have been brought against him as well.'" Vasconcellos v. City of New York, No. 12-CV-8445 (CM), 2014 WL 4961441, at *8 (S.D.N.Y. Oct. 2, 2014) (emphasis added) (quoting Malament v. Vasap Constr. Corp., 285 A.D.2d 584,

584, 728 N.Y.S.2d 381, 381 (2d Dept. 2001)). Since, "[t]his requirement closely tracks the federal relation-back requirement of Rule 15(c)(1)(C)," plaintiff "thus fails to satisfy the state's corollary to that rule, as well." Id.; see also Buran v. Coupal, 87 N.Y.2d 173, 179 (1995) (noting that § 203 was largely modeled after Rule 15(c) of the Federal Rules of Civil Procedure).

Accordingly, because plaintiff's claims against the Newly-Named Defendants in the Third Amended Complaint do not relate back to the original pleading under either federal or state law, defendants' motion to dismiss on statute of limitations grounds should be granted as to the Newly-Named Defendants.

CONCLUSION

For the reasons stated above, defendants' motion to dismiss the Third Amended Complaint is denied in part and granted in part. Plaintiff has sufficiently alleged the plausibility of the claim that there was such a Hepatitis policy, as well as the personal involvement of Governor Pataki. However, plaintiff's claims against Dr. Curtin and Dr. O'Connell are dismissed without prejudice for failure to allege personal involvement under Section 1983, and plaintiff's claims against Acting Commissioner Annucci, Dr. Koenigsmann, Dr. Augustin, and Dr. Sheikh are barred by the statute of limitations.

SO ORDERED.

Dated: Brooklyn, New York
       March 13, 2015

                            /s/ Judge Raymond J. Dearie

                            RAYMOND J. DEARIE
                            United States District Judge